902 F.2d 34
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Erma ROUSH, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 89-3644.
 United States Court of Appeals, Sixth Circuit.
 April 30, 1990.
 
 Before KEITH and MILBURN, Circuit Judges; and GEORGE E. WOODS, District Judge*.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Erma L. Roush ("claimant" or "Roush") appeals the judgment of the district court affirming the Secretary's denial of supplemental security income ("SSI") benefits. For the reasons that follow, we reverse.
 
 I.
 A.
 
 2
 After Roush's application for benefits was denied initially and upon reconsideration, she secured a hearing before an ALJ. The ALJ denied Roush's claim, and the Appeals Council adopted the ALJ's decision as the final decision of the Secretary. Roush then filed this action in the district court, and the district court referred the case to a magistrate who recommended upholding the Secretary's denial of benefits. Roush objected to the magistrate's report and recommendation; however, on May 16, 1989, the district court adopted the report and recommendation of the magistrate as its own. This timely appeal followed.
 
 B.
 
 3
 Roush was 52 years old on the date of the ALJ's decision. She has an eighth-grade education, and her past relevant work is as a waitress and a worker in a plant nursery. Both jobs are classified as light exertional level, semi-skilled. At the hearing, Roush testified of numerous problems including shortness of breath, chest pain, dizziness, nervousness, stomach problems, stress, headaches and fatigue. She also has the residuals of an automobile accident in which she sustained hip, pelvic, and back injuries. She takes medication for stomach problems, arthritis, chest pain, hypertension, nerves and breathing difficulties. She testified that she was unable to stand more than ten minutes, sit more than sixty minutes, or walk more than one block.
 
 
 4
 Her treating physician, Dr. Girouard, indicated that she could not endure an eight-hour workday because she was unable to walk, sit or alternate for longer than two hours, though he did not specify the exact health problem that imposed the limitations. Dr. Girouard also indicated that Roush could lift up to 20 pounds, but only occasionally, and should avoid pushing and pulling and operating foot controls. Over the course of treatment, Girouard diagnosed chronic obstructive pulmonary disease but was unable to substantiate complaints of heart trouble. He treated Roush for a fractured pelvis and sacrum sustained in the car accident. He often prescribed medication for complaints of pain. Dr. Girouard reported that most of Roush's symptoms were attributable to anxiety and depression.
 
 
 5
 Hospital records concerning the injuries sustained in the automobile accident confirmed pubic rami fractures as well as a fractured sacrum. Under physical therapy in 1986, Roush exhibited significant improvement from these injuries. Other hospitalization records confirmed breathing problems, some minor irregularity in ventricular contractions, and some anxiety and somatic problems.
 
 
 6
 Dr. Park, a psychiatrist, performed a psychiatric evaluation of Roush at the request of the Secretary in 1985. Dr. Park reported ongoing daily activities, ability to understand, remember, and carry out simple tasks and ability to interact with supervisors and co-workers.
 
 
 7
 Later, in response to Roush's interrogatories, Dr. Park admitted Roush showed some diminished interest and energy and exhibited symptoms of depression. In an accompanying functional evaluation, he rated her impairments as moderately severe regarding most of the activities recognized as important to maintaining gainful activity. He confirmed his earlier diagnosis of dysthymic disorder and psychogenic pain disorder.
 
 
 8
 The Secretary requested a vocational evaluation from the Cincinnati Evaluation Center and one was attempted in December 1985. It was reported that Roush applied only marginal effort and did not pay careful attention to instructions. Weschler Adult Intelligence Scale ("WAIS") testing revealed an IQ of 79 which placed Roush in the borderline range of intellectual functioning. She had difficulty listening and in comprehending and remembering instructions. She read at the eighth-grade level. Minnesota Multiphasic Personality Inventory ("MMPI") results showed hysteroid characteristics and a limited tolerance for stress tending toward somatic symptoms. Though no evaluation was made concerning her vocational skills, it was reported that there were no psychological problems which would prohibit her from sustained competitive employment. However, the report stated that she did not have the physical tolerance to engage in sustained competitive employment. Throughout the evaluation Roush appeared persistently fatigued and pale, and she sometimes fell asleep. At one point she fell into such a deep sleep that she was hard to awaken.
 
 
 9
 Later, Roush saw Dr. Eugene Cherry, Ph.D., at the request of her attorney. Dr. Cherry reported a capacity for living independent of supervisory care with the ability to understand and remember in the performance of simple, well-structured tasks. WAIS testing showed an IQ of 79. Her MMPI profile showed a tendency to exaggerate to present herself in a positive light. Certain scores indicated denial of emotions with resulting intensification of physical problems, and other scores were consistent with depression, feelings of inadequacy, loss of sleep, loss of appetite, loss of concentration and panic attacks. Dr. Cherry diagnosed psychological factors affecting physical condition, dysthymic disorder with anxiety, borderline intellectual functioning and a passive-aggressive personality disorder.
 
 
 10
 Cherry reported a severely impaired ability to carry out simple job instructions, moderately severely impaired ability to interact with others and severely impaired ability to maintain attention and concentration. In a functional evaluation of ability to do work related functions, Dr. Cherry rated Roush's impairments as moderately severe to severe in almost all categories.
 
 
 11
 Dr. Cherry appeared as a witness for Roush at the hearing. He confirmed his earlier diagnosis and added psychogenic pain disorder as consistent with the diagnosis of psychological factors affecting physical condition. He also stated the opinion that Roush met Section 12.04 of the listings found at 20 C.F.R. Part 404, Subpt. P, App. 1 (1989). To support his opinion he cited the factors necessary under paragraph A criteria and paragraph B criteria to show a recognized mental impairment of required severity to meet the listings. When questioned by the ALJ as to why claimant could not perform simple repetitive tasks, Dr. Cherry cited slow response time due to depression and psychomotor retardation.
 
 
 12
 Dr. Allan Barclay, Ph.D., testified at the hearing as an advisor to the ALJ. Barclay rejected Dr. Cherry's evaluation citing his failure to "norm" his test results against a large population of borderline mentality. Barclay claimed that Roush's low mentality skewed the test results and that the slow response time was probably due to Roush's low mentality. When Barclay was cross-examined concerning the failure to norm, he admitted that no such norm had been established and no significant difference of opinion existed in the profession to support his views. Barclay claimed he helped write the Federal Regulations relating to psychological testing and mental impairments. However, under cross-examination he revealed a lack of knowledge as to the meaning of severe impairment[1] and refused to recognize any of Roush's impairments as severe.
 
 
 13
 From Barclay's assessment that Roush was not severely impaired, it followed that she could do simple repetitive tasks at light exertional level. Despite Barclay's testimony, the ALJ found that Roush had severe impairments and posed a hypothetical question to Barclay assuming histrionic traits, low IQ and a tendency to exaggerate. Based upon the hypothetical, Barclay opined that Roush could still engage in sustained competitive employment. Barclay was not asked how he would have rated her capacity if psychogenic pain disorder and dysthymic disorder had been included in the hypothetical.
 
 
 14
 Barclay based his assessment of no severe impairment on two exhibits in the record. The first was exhibit 37, a report from the Cincinnati Evaluation Center performed by an evaluator without a Ph.D. degree. The second was a functional evaluation done by Dr. Patricia Semmelman, Ph.D, a non-examining consultant, made by relying upon the report from the Cincinnati Evaluation Center. Under cross-examination, Barclay admitted he gave no weight to the report of Dr. Park, a psychiatrist, because psychiatry was not "well based in the behavioral sciences." Barclay also admitted under cross-examination that he had never personally performed a disability evaluation and that he was additionally disadvantaged in this case by not having examined the claimant personally.
 
 
 15
 The ALJ asked a vocational expert ("VE") to assume that Roush had the following characteristics: (1) age over 50, (2) eighth-grade education, (3) past relevant work as a waitress and plant nursery worker, (4) exertional capacity for light work, and (5) non-exertional capacity limited to simple, repetitive tasks with low to moderate levels of stress and no direct dealing with the public. The VE identified numerous jobs that a person with the assumed characteristics could perform.
 
 
 16
 Under questioning from Roush's attorney, the VE admitted that if Roush were as functionally limited as stated by her treating physician, or Dr. Cherry, or Dr. Park, she could not perform any of the named jobs. The VE verified that if Roush became tired and fatigued as easily as she claimed or as stated in the December 1985 vocational evaluation by the Secretary, she could not perform any of the proposed jobs.
 
 
 17
 After the hearing and denial of her claim, Roush's attorney sent her to Dr. G.B. Sastry, a psychiatrist, for evaluation, and his report was made part of the record by permission of the Appeals Council. Dr. Sastry referred to Dr. Cherry's work as excellent, and, for the most part, Dr. Sastry's report agreed with Dr. Cherry's. Dr. Sastry submitted an opinion that Roush was disabled.
 
 
 18
 The principal issue presented for review is whether substantial evidence supports the Secretary's determination that Roush retained the residual functional capacity for gainful employment in light of the Secretary's rejection of the opinions and diagnoses of Drs. Girouard, Park, Cherry and Sastry in favor of the testimony of the non-examining medical advisor, Dr. Barclay.
 
 II.
 A.
 
 19
 The scope of judicial review in social security cases is limited to determining "whether the Secretary's findings are supported by substantial evidence and whether the Secretary correctly applied the law." Mullis v. Bowen, 861 F.2d 991, 992-93 (6th Cir.1988). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality of evidence must be based on the record as a whole and must consider whatever in the record fairly detracts from its weight. Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984).
 
 B.
 
 20
 The ALJ found that claimant was severely impaired by chronic obstructive pulmonary disease, residuals of pelvic and sacral fractures, bronchitis, borderline intellectual functioning, dysthymic disorder, psychogenic pain disorder and histrionic traits. He found that these impairments did not meet or equal a listed impairment, but they did prevent Roush from performing her past relevant work. The ALJ further found that Roush retained the residual functional capacity for light exertion with additional nonexertional limitations confining her to low stress, simple repetitive tasks involving no direct dealing with the public.
 
 
 21
 When the evidence in this case is reduced to its essence, all the medical and psychological evidence, save the testimony of Dr. Barclay, Ph.D., and the report of Dr. Patricia Semmelman, Ph.D., points to a finding that Roush's functional capacity was more limited than the ALJ would believe. Roush argues that the Secretary erred by discounting the findings and opinions of her treating physician and corroborating evidence "in favor of the hearsay opinions of non-examining clinicians." On the facts of this case, we agree.
 
 
 22
 First, we note that Dr. Girouard was the only medical expert in this case to qualify for the deference due a treating physician. See Sherrill v. Secretary of Health & Human Serv., 757 F.2d 803, 805 (6th Cir.1985) (per curiam). However, mental disorders are not uncommonly diagnosed after one referral interview as we recognized in Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir.1989) (per curiam). Thus, we will not treat the opinions and diagnoses of the examining mental health consultants lightly, and we recognize that they can supply sufficient evidence to establish an impairment. See id.
 
 
 23
 And, though explanation of hearsay medical reports by an impartial medical advisor has been approved by the Supreme Court, Richardson, 402 U.S. at 407-08, we believe that evidence supplied by an expert who conducted his own examination is generally more weighty. See Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir.1985) (per curiam) (little weight given to experts who do not examine the claimant); cf. Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir.1987) (opinion of non-examining physician given little weight when contrary to treating physician). In fact, the psychological advisor in this case, Dr. Barclay, admitted under cross-examination that he was disadvantaged by not having made a personal evaluation.
 
 
 24
 Barclay's failure to examine the claimant is compounded in this case because he relied upon the testimony of Dr. Patricia Semmelman, Ph.D., who also failed to personally examine Roush. Testing done by the Cincinnati Evaluation Center was the original source for both Barclay and Semmelman, but that testing was performed by personnel without a Ph.D. degree, and the Cincinnati Evaluation Center found Roush to be disabled, albeit for physical rather than mental reasons.
 
 
 25
 We find several other problems with the ALJ's dependence upon the testimony of Psychologist Barclay. First, Barclay criticized Dr. Cherry, Ph.D., for failure to "norm" Roush's test results against a large population with low mentality; however, on cross-examination he admitted that no such norm had been established. Barclay was forced to admit that there was not even a significant difference of opinion in the profession supportive of his view. We note that the Secretary has approved WAIS and MMPI testing (used by Dr. Cherry) for documentation of mental impairments without imposing a duty to norm. See 20 C.F.R. Part 404, Subpt. P., App. 1, Sec. 12.00(D) (1989).
 
 
 26
 Secondly, Dr. Barclay, Ph.D., refused to give any weight to the report of Dr. Park because psychiatry, in Barclay's view, was not "well based in the behavioral sciences." Again, Barclay tries to set a more stringent standard than the Secretary. The Secretary has recognized that psychiatrists' reports are acceptable documentation of a mental impairment. Id.
 
 
 27
 Also, Barclay claimed to "have assisted in the development of the Federal Regulations as they relate to psychological testing and the Mental Impairments Listings," yet, during cross-examination it became apparent that he did not know the true meaning of severe impairment. Finally, Barclay admitted under cross-examination that he had never personally administered disability evaluations.
 
 
 28
 Turning to the evidence in Roush's favor, we first encounter Roush's argument that the major error below was in discounting the severity of her mental impairments and their exacerbating effects upon her physical problems including pain. The ALJ accepted as fact that claimant had severe chronic obstructive pulmonary disease, the residuals of pelvic and sacral fractures, bronchitis, dysthymic pain disorder, psychogenic pain disorder, and histrionic traits. Still, he rejected Dr. Girouard's evaluation that claimant could not sit, stand, or alternate for longer than two hours at a time. The ALJ cited a lack of medical evidence to support such a limited capacity and also stated that the subjective complaints were not fully credible "in light of the medical evidence; especially due to the repeated finding of histrionic traits and a psychogenic pain disorder."
 
 
 29
 Roush argues that the reports of the examining mental health experts, rather than proving a lack of credibility, corroborate the subjective complaints and Dr. Girouard's opinion of disability.[2] We agree.
 
 
 30
 When the functional evaluation given by Dr. Park was submitted to a VE in the form of a hypothetical, the VE stated that a person with the assumed limitations could not perform substantial gainful activity. The Cincinnati Evaluation Center was not convinced that Roush was disabled from psychological impairments, but did state that Roush was not physically capable of maintaining sustained gainful activity. Finally, the testimony and reports of Dr. Cherry were clearly indicative of disability and, in fact, showed impairments which met section 12.04 of the mental listings.
 
 
 31
 The ALJ rejected the findings and opinion of Dr. Cherry, Ph.D., for two reasons, neither of which we find persuasive. First, he found an inconsistency between Dr. Cherry's functional evaluation that Roush was severely impaired in her ability to carry out simple job instructions and his report that she had the ability to perform simple well-structured tasks as part of her daily activities. Standing alone, this minor inconsistency or ambiguity was not a good reason for rejecting Dr. Cherry's assessment. Cf. King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984) (may reject opinion of treating physician for good reason). The primary reason for the ALJ's rejection of Dr. Cherry's testimony was his acceptance of Dr. Barclay's testimony as more "fully credible." Given the weaknesses we have identified in Psychologist Barclay's testimony, we are unwilling to defer to the ALJ's choice.
 
 
 32
 Thus, we hold that there was not substantial evidence to support the ALJ's determination that Roush retained the residual functional capacity to perform light exertional work involving low stress, simple repetitive tasks with no direct dealing with the public. Therefore, the ALJ failed to carry the burden of proving that claimant was capable of performing work which existed in the national economy--a burden he assumed upon finding that Roush could not perform her past relevant work. Kirk v. Secretary of Health & Human Serv., 667 F.2d 524, 529 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983). Moreover, the assessment of Dr. Cherry was well documented and showed a disability under section 12.04 of the mental listings. The questionable testimony of Dr. Barclay did not constitute substantial evidence for rejecting Dr. Cherry's assessment.
 
 III.
 
 33
 Accordingly, for the reasons stated, the judgment of the district court is REVERSED, and this case is REMANDED to the district court with instructions to remand to the Secretary for an award of benefits.
 
 
 
 *
 Honorable George E. Woods, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Barclay defined a severe impairment as one which was incapacitating and preventive of gainful employment. We have stated that an impairment is non-severe only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." Farris v. Secretary of Health & Human Serv., 773 F.2d 85, 90 (6th Cir.1985) (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984))
 
 
 [2]
 The Secretary argues that Roush fails to meet the test for disabling pain set forth in Duncan v. Secretary of Health & Human Serv., 801 F.2d 847, 853 (6th Cir.1986). The Secretary's argument assumes that mental conditions cannot satisfy Duncan. The underlying condition can clearly be, at least in part, a non-physiological mental condition. Blankenship v. Bowen, 874 F.2d 1116, 1123 (6th Cir.1989) (per curiam)