**Billy BLANKENSHIP,
Plaintiff–Appellant,**

**v.**

**Otis R. BOWEN, M.D., Secretary of the Department of Health and Human Services, Defendant–Appellee.**

No. 88–5078.

United States Court of Appeals,
Sixth Circuit.

Submitted Nov. 15, 1988.

Decided May 17, 1989.

Steve Blanton, Pikeville, Ky., for plaintiff-appellant.

Billy Blankenship, Argo, Ky., pro se.

J.S. Osborn III, Office of the U.S. Atty., Lexington, Ky., for defendant-appellee.

Before NELSON and BOGGS, Circuit Judges; and ENSLEN, District Judge.[*]

PER CURIAM.

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health and Human Services denying appellant's claim for disability insurance benefits. On July 30, 1985, appellant filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of February 23, 1979. Benefits were denied initially and upon reconsideration. Appellant requested and was granted a hearing before an Administrative Law Judge (ALJ). The ALJ, noting that appellant last met the insured status requirements on June 30, 1985, concluded that appellant was only entitled to an award of supplemental security income (SSI). (Tr. 24–25, 50–67, 71). This decision became the final determination of the Secretary when the Appeals Council denied plaintiff's request for review May 7, 1987. Appellant now appeals the District Court's November 20, 1987 affirmation of the Secretary's decision.

Appellant was 32 years old on the day of the hearing before the ALJ. He testified that he had relevant work experience as a theater clerk, a janitor, and a coal miner. He claimed he was injured lifting timber at the coal mine. Something had snapped in his back, and he fell and struck his neck and head. He was examined in the hospital. Skull, cervical spine, and lumbosacral spine x-rays were negative. He began suffering from back pain and constant leg aches, and eventually had to quit work. (Tr. 53–57, 118).

Plaintiff did not seek further back treatment until January of 1985. Orthopedic surgeon Shafer diagnosed appellant with chronic lumbar sprain. X-ray series were unremarkable, and the doctor noted only tenderness in the back with reduced range of motion. Despite these limited clinical findings, Dr. Shafter opined in a letter dated February 1, 1985, that appellant and a possible ruptured lumbar disc with left arm contusion.[1] (Tr. 118–121).

Dr. Guberman conducted a consultative exam in September of 1985. He found appellant to be a poor historian, contradictory, and inexact. Appellant mentioned more than one injury at the mine in 1979, and talked of treatment at hospitals not mentioned in the record. On examination, the doctor found appellant hostile, unfriendly, sullen, and withdrawn, complaining of pain throughout his entire body. The physical exam revealed moderate tenderness in the cervical and lumbar spine, limitation in range of motion, and muscle weakness and diminished sensory capacity in the entire right side. However, reflexes were normal, there was no muscle atrophy, and evidence of nerve root damage was absent. The doctor diagnosed appellant with acute and chronic lumbosacral and cervical spine strain, post-traumatic. X-rays were negative. (Tr. 123–25, 131).

Appellant was also seen that month by orthopedic surgeon Rapier. Appellant complained that his condition had gotten worse over the last two or three years. X-rays revealed slight narrowing at the L5–S1 level. Dr. Rapier concluded that appellant could have mild degenerative disc disease. (Tr. 136–37). A December 1985 CT scan was ordered by Dr. Shafer and revealed posterior disc bulging, especially to the left side, and deformity of the thecal sac. (Tr. 141).

Based on the medical records, the ALJ concluded that appellant suffered from a very mild degree of degenerative disc disease. Based on the findings of the CT scan, the ALJ found that appellant could not perform heavy work activities; however, his orthopedic impairment was not

---

[*] The Honorable Richard A. Enslen, United States District Judge for the Western District of Michigan, sitting by designation.

1. This letter was not presented before the ALJ, but was considered by the Appeals Council. (Tr. 8).

severe enough to preclude the performance of light work activities. As for appellant's subjective complaints of pain, the ALJ stated:

> After weighing the significance of the results of numerous diagnostic tests performed by Dr. Shafer, and the various medical opinions expressed by consulting specialists, the Administrative Law Judge finds that prior to November 13, 1985 the claimant's symptoms of pain did not preclude performance of light work activities.

(Tr. 23).

Appellant also claimed a nonexertional impairment. Dr. Wayne conducted four diagnostic tests on appellant in October of 1980. Appellant was neatly groomed and friendly, and no bodily impairments were indicated. The doctor reports:

> He stated that his back hurts constantly. He feels weak and tired. He panics and is afraid something will happen to him. He suffers constantly from severe headaches. He feels like something is choking him in the throat. The patient has chest pains. He has seen various doctors. He cannot tolerate any noise at all. Any time he finds himself in a crowd of people he gets very upset.

(Tr. 129). I.Q. testing revealed a very low range of intelligence, and although he could follow instructions, he was slow to answer questions on verbal and performance testing. Visual motor testing showed no organic brain damage, but the visual retention test indicated a developed mild memory impairment. Ink–Blot tests indicated that appellant had a developed psychoneurotic disorder. Although he had fair interpersonal relations, he had difficulty controlling impulses. On his mental status in general, the doctor stated:

> He had some difficulty expressing himself and describing his symptoms. His

verbal productivity and spontaneity were below normal limits. The patient appeared to be moderately anxious during the clinical interview. No bizarre or delusional material was noted. He was correctly oriented as to place, person and time. The patient's memory, concentration and attention appear to be defective to some degree.

(Tr. 130). He was diagnosed with generalized anxiety neurosis,[2] moderate and chronic, associated with physical difficulties. His prognosis was guarded and the doctor believed that the 1979 injury precipitated the psychiatric disorder. Permanent partial disability was estimated at thirty percent.

Appellant was seen one year later by Dr. Feuss, a psychiatrist. This analysis was done through handwriting samples and an interview. Appellant's handwriting was not appropriate for a man with one year of college. During the interview, appellant emphasized his irritability rather than feelings of physical pain, and when speaking, La Belle Indifference (inappropriate expression) was noted. Although the doctor did not fully accept appellant's claims of hallucinations, the doctor was concerned about appellant's extreme religiosity. Appellant was considered well-oriented, but his memory was somewhat fuzzy and his insight and judgment were poor. Appellant was diagnosed with conversion reaction.[3] Appellant demonstrated indifferent affect, fuzzy hallucinations, and non-physiological symptoms. Dr. Feuss also remarked that this type of condition could start with one traumatic incident, but the underlying cause is a long-standing personality developmental condition. Appellant was considered thirty percent disabled. (Tr. 132–33).

---

**2.** Generalized anxiety disorder is characterized by tension, hyperactivity, apprehension and difficulty in concentration. These symptoms are different maladaptive ways in which a person attempts to alleviate feelings of anxiety that are more extreme than one would normally be experiencing given the conditions of one's life. Gordy–Gray *Attorneys' Textbook of Medicine*,

Paras. 101.44(1), 101.44(2) and 101.44(2a) (1987).

**3.** This is a type of somatoform disorder. With these disorders, "attempts to alleviate anxiety give rise to symptoms suggestive of physical disorder, but with no demonstrable organic disorders." *Id.* at 101.44(2b).

Dr. George, a psychiatrist, examined appellant in September of 1982. After the interview, Dr. George stated,

Examination shows him to be a slightly overweight 28–year old man who is neatly dressed and groomed. He walks rather slowly and stiffly, has a rather flat, staring expression and lacks spontaneity. Frequently he says, 'I don't know' or 'I don't remember' and does seem to have difficulty with recent events. I didn't see any evidence of delusional thinking or hallucinations today but he claims to have had the visual hallucinations of other people being in the room. He implies also that when people get loud and boisterous in the community it is very threatening and he overreacts and can't explain really why. He does appear to be a little depressed and made reference to the fact that he has thought of hurting himself, but as far as I can tell, has never done anything. His fund of knowledge seems rather low for a man of his education. Much of this may be due to the fact that he doesn't try very hard and is more preoccupied with his present symptoms.

(Tr. 135). Appellant was diagnosed with schizoid personality.[4] The doctor did comment on the difficulty he had evaluating appellant without testing and a more accurate history. Appellant appeared a borderline individual with a psychotic-like appearance and thinking (although he could not say appellant was a clear-cut schizophrenic). Lacking any information relating to appellant's personality prior to the accident, the doctor would not make an assessment as to the relation between the 1975 accident and his current personality status. However, the doctor stated that appellant was significantly handicapped by his emotional problems and in need of psychiatric treatment. (Tr. 134–35).

The final psychiatric exam took Place November 13, 1985. Dr. Lurie reviewed the previous psychiatric tests and reports, and interviewed appellant. He also had evidence of the physiological condition, and a 1983 opinion from the Worker's Compensation Board.[5] Appellant was incapable of giving specific and detailed information and was unable to explain his "all over" pain.

On mental status examination, Mr. Blankenship was noted to walk stiffly and slowly into the examining room and evidenced psychomotor retardation in both his speech and behavior. He sat rigidly in his chair holding onto his cane which he used in walking. An expressionless, mask-like facies was noted and he tended to stare as if preoccupied. He appeared to be uncertain, bewildered and unsure of anything, having great difficulty in making a definite statement. He spoke in definite general terms, making it necessary to extract information from him. His speech was slow and he related in a simple, child-like manner. He had difficulty in comprehending anything but the simplest words and overall appeared quite obtunded. Clinically he appeared to be of severely limited intellectual endowment in sharp contrast to reportedly having graduated from high school at age 22 [he took some time off for 'depression'], followed by some college education. His memory was impaired for events of the intermediate to remote past and vague for the recent past. He was able to give the date correctly but had no idea of his wife's age or birthday. The sensorium was clouded and he described some vague auditory hallucinations while denying visual hallucinations. His affect was one of apathy and was decreased in both quantity and range while the mood was depressed.

(Tr. 139–40). Dr. Lurie believed appellant's mental status had severely deteriorated

---

**4.** This is a personality disorder similar to that of schizophrenia only milder. Schmidt, *Attorneys' Dictionary of Medicine* (1988). Schizophrenia is characterized by withdrawal from reality, unpredictable emotional response, introversion and regression, inappropriate response and unsocial behavior. *Id.*

**5.** Evidence of the Workers' Compensation decision is found in Dr. Lurie's report, which states: "The Workers' Compensation Board has previously recognized in their Opinion and Award of 6/6/83, that the psychiatric condition represents a pre-existing, dormant, and non-disabling emotional condition triggered into disability reality by the injury of 2/23/79." (Tr. 140).

since his three previous mental exams, but noted that deterioration was of a progressive nature even then. It had presently deteriorated into a schizophreniform disorder, if not actual schizophrenic disorder.[6] After repeating the Worker's Compensation Board findings, Dr. Lurie concluded, "the psychiatric disorder has resulted in a total (100%) disability from both an occupational and a body functional standpoint aside from any physical or orthopedic disability which he may have." (Tr. 140).

Addressing these nonexertional limitations, the ALJ concluded that appellant primarily suffers from a mental disorder that has slowly progressed in intensity since 1979. He stated that appellant was not a schizophrenic, but had an affective disorder. Although appellant had satisfied the § 12.04(A) criteria for affective disorder under the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1) even at the time of Dr. Wayne's 1980 assessment, appellant did not meet the functional limitations required by 12.04(B) until November 13, 1985. Only on that date did appellant's emotional instability create a marked restriction on his daily living and marked interference with the ability to function socially. Prior to that date, his nonexertional condition only restricted him to engaging in low stress work not involving dealing with the public.[7] The ALJ continued,

> [T]he Administrative Law Judge finds that the occupational base of sedentary and light jobs of which the Secretary has taken administrative notice was not significantly reduced by the combined functional affects of the claimant's exertional and nonexertional limitations prior to November 13, 1985. Prior to this date, the claimant was capable of performing a

significant number of occupations involving simple, repetitive tasks in low-stress work settings within the framework of the vocational grid rules [20 C.F.R. Part 404, Subpart P, Appendix 2].

(Tr. 22). It is this conclusion that appellant now challenges.

The district court believed that the Secretary had been charitable in restricting appellant to only low-stress work prior to November 13, 1985. Appellant was found only "a little depressed" and no opinion was expressed about his capacity for work. Physiologically, the court found appellant's case wanting because all laboratory exams conducted prior to the expiration of appellant's insured status returned negative results.

"The jurisdiction of this court is confined to a limited review of the Secretary's decision and of the record made in the administrative hearing process." *Willbanks v. Secretary of Health and Human Services*, 847 F.2d 301, 303 (6th Cir.1988). As stated in *Mullen v. Bowen*, 800 F.2d 535 (6th Cir.1986) (en banc):

> the substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because the substantial evidence would have supported an opposite decision.

*Id.* at 545 (quoting, *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984). To withstand review, the Secretary's determination must be substantially supported by the factual record and be based upon proper legal

---

6. Schizophreniform resembles or has the general characteristics of schizophrenia. *Id.* This type of mental disorder manifests itself through characteristic disturbances of communication, language, thought, mood, perception, and behavior. *Attorneys' Textbook of Medicine*, at 104.44(8a).

7. To reach this conclusion, the ALJ determined that Dr. Wayne's finding of average intelligence, mild memory loss, and moderate anxiety did not have any significant impact on appellant's

functional capacities. Appellant could still do complex tasks. And Dr. Feuss' functional restriction findings were similar. The ALJ discounted Dr. George's conclusions altogether because the finding of schizoid tendencies was made only after one examination and the doctor noted a less than clear diagnostic picture. The ALJ considered Dr. Lurie's assessment as the first documentation of a disabling mental illness.

criteria. *Gaffney v. Bowen*, 825 F.2d 98 (6th Cir.1987).

■ Although the Secretary is not required to present evidence that would eliminate a possible onset date any time from 1979 through 1984, the Secretary still must establish by substantial evidence that the disability began November 13, 1985. *Willbanks*, 847 F.2d at 303. Considering all the evidence which detracts from this finding, including appellant's subjective complaints and the proper weight they are to be given, the Secretary has not met this burden.

The medical evidence establishes that appellant's 1979 injury precipitated the progressive psychiatric disorder. In 1980, he was diagnosed with moderate and chronic generalized anxiety neurosis associated with physical difficulties. In 1981, Dr. Feuss diagnosed appellant with conversion reaction. In 1982, appellant was diagnosed with schizoid personality, and by 1985, appellant was suffering from schizophreniform disorder if not actual schizophrenic disorder. And the CT scan indicated that prior to November 13, 1985, appellant was limited in his exertional capacity. Although there is no dispute with the Secretary's findings that appellant's exertional impairment limits him to performing light work, the conclusion that appellant's combination of impairments is not disabling at any time prior to the expiration of his insured status is unsubstantiated.

First, an onset date of November 13, 1985 is not supported from a purely psychological standpoint. His mental disease was progressive in nature. It could not have occurred suddenly. Even Dr. Guberman, who examined appellant in September 1985, found appellant hostile and uncooperative.

Second, the ALJ erroneously disregarded Dr. George's findings. These findings were discounted because Dr. George examined appellant on only one occasion and there was not present a clear diagnostic picture. "The claimant presented psychotic complaints that did not agree with the documented clinical findings." (Tr. 22). However, upon review of the record, the court finds no medical evidence contradicting Dr. George's conclusion. No other examination was conducted at that time, and the examination was supported by specific and complete medical findings:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment ... consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.... In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices [*sic*] in order to obtain objective clinical manifestations of medical illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C.Cir.1987), quoting *Lebus v. Harris*, 526 F.Supp. 56, 60 (N.D.Cal.1981).

There are no valid reasons to question Dr. George's conclusions that appellant had a schizoid personality and was severely handicapped thereby. Mental disorders are not uncommonly diagnosed after one interview. Although Dr. George noted the difficulty in evaluating appellant without the benefit of psychological testing and a more accurate history, the doctor did believe appellant to be a "rather borderline individual with psychotic-like appearance and thinking." (Tr. 135). He did not think appellant was a clear-cut schizophrenic and was unwilling to correlate the accident to his mental condition without more information. The doctor remained, however, capable of concluding that appellant was significantly handicapped by his mental problems. It is clear that when the doctor was unable to draw a conclusion based on the information obtained during the interview, a diagnosis

or opinion was not offered. His unwillingness to draw those conclusions is not a justification for discounting the assessments Dr. George was able to make.[8]

Third, the Secretary's conclusion that appellant was not disabled until November 13, 1985 runs counter to Social Security Rule (SSR) 83–20.[9] SSR 83–20 was established to state the policy and describe the relevant evidence to be considered when establishing the onset date of disability. It provides in part:

The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. Factors relevant to the determination of disability onset include the individual's allegations, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegations or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.

A Title II worker cannot be found disabled under the Act unless insured status is also met at a time when the evidence establishes the presence of a disabling condition(s). Although important to the establishment of a period of disability and to the payment of benefits, the expiration of insured status is not itself a consideration in determining when disability first began....

With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the disease process.

Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached Listing severity, (i.e., be decided on medical grounds alone) before onset can be established.

Dr. Lurie believed appellant's condition was, by 1985, severe enough to render appellant one hundred percent disabled based on his psychological condition alone. That is why the ALJ chose his examination date as the onset of appellant's disability. By choosing this date, the ALJ was, in effect, erroneously requiring the impairments to reach Listing severity before finding appellant disabled, and erroneously failing to draw any inferences from the medical and other evidence as to whether appellant was able to engage in substantial gainful activity prior to the expiration of his insured status.

In addition, and somewhat acknowledged by SSR 83–20, there is the common sense notion that appellant did not suddenly find himself, five months after the expiration of his coverage, completely incapacitated by his schizophreniform disorder. To conclude that appellant's mental impairment only prevented him from working with the public or from working in normal stress level employment until and beyond June 30, 1985 ignores the slowly progressive nature of appellant's mental impairment, ignores the severity of that impairment, fails to account for Dr. Guberman's statements as to appellant's sullenness and hostility, and gives the appearance that the examination date was solely chosen because it fell outside the insured status time period.

Fourth, the court has some difficulty with the Secretary's assessments of appellant's subjective statements. During the

---

8. The ALJ also negatively commented about the referral nature of the psychiatric interviews. There is nothing fundamentally wrong with a lawyer sending a client to a doctor, especially when the capacity of that client to care for himself is questionable. *Bolling v. Bowen,* 682 F.Supp. 864 (W.D.Va.1988).

9. Pursuant to 20 C.F.R. § 422.408, social security rulings are binding on all Social Security Administration personnel, including state agency adjudicators, administrative law judges, and the Appeals Council. *McDonald v. Secretary of Health and Human Services,* 795 F.2d 1118 (1st Cir.1986).

hearing, appellant claimed that he is unable to walk one-half block, or stand, sit, or lift anything for more than a minute. The slightest exertion makes him short of breath, and wearing a back brace keeps him in misery. He states he is nervous all of the time and this condition is not alleviated by medicine. He cannot mow, shop, socialize, or fish, and he spends his day watching television. His only outside activity is attending church. (Tr. 57–64). He has been experiencing his pain since his 1979 injury, and, in fact, that is what caused him to quit his job. He did, however, testify that his condition continues to worsen. (The ALJ observed appellant to be walking with a cane and displaying a very flat affect during the hearing.) (Tr. 19). The ALJ stated that appellant's subjective complaints of severe pain were not substantiated by the diagnostic tests and consulting specialists' opinions. This assessment fails because it does not take into consideration the effect appellant's nonexertional impairment has on his capacity to tolerate pain, and does not refer to the subjective symptoms of panic, tension, and frustration.

■ Subjective complaints of pain or other symptoms may support a claim of disability. However, these complaints must be evidenced by an underlying medical condition, and there must be either objective medical evidence confirming the severity of the alleged pain, or there must be an objectively determined medical condition of a severity which can reasonably be expected to give rise to that pain. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1003 (6th Cir.1988); *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir.1986). This subjective symptomology is not limited to complaints of pain resulting from physiological impairments, but includes symptoms such as nervousness resulting from a mental impairment. 20 C.F.R. § 404.1529. Objective evidence of the pain or other subjective symptoms is not required. *Duncan,* 801 F.2d at 853.

Appellant presented objective medical evidence of disc degeneration. He also presented evidence of a mental disorder that even as early as 1981 indicated the presence of conversion reaction. Whereas the objective evidence of the disc degeneration may only support a finding that appellant was precluded from medium or heavy exertional level work, there is also the added factor that appellant's objectively determined mental impairment was likely to exacerbate those feelings of pain. At the very least, a psychopathologist noted his excessive focus on that pain.

But back pain was not the only subjective symptom appellant expressed. In 1980 he reported feeling panic, fear, severe and constant headaches, a choking sensation, and chest pains. He also had an inability to tolerate any noise. Appetite and sleep were poor, and he had no social life. (Tr. 129). In 1981, he noted nervousness in his report to Dr. Feuss, along with hot-tempered tendencies, a proclivity for stumbling, and an intolerance for noise. In 1982, he repeats his feelings of nervous trouble interfering with his sleep, a smothering and choking feeling, and irritation with people. He notes his depression and a tendency to overreact; and explained that an early attempt to return to work resulted in feelings of everything closing in on him. This was the year a psychiatrist found appellant to be significantly handicapped by his emotional condition.

Appellant's allegations of pain, panic, and depression, are supported by evidence of underlying musculoskeletal and emotional impairments. Considering these objectively established medical conditions in combination, it is not unreasonable that the subjective symptomology also considered in combination exists to the extent alleged.[10] Despite the ALJ's statement that the combined effects of appellant's nonexertional

---

**10.** Not only is conversion reaction a form of somatoform disorder which would make complaints of pain without etiological basis reasonable, appellant was by 1982 diagnosed with a condition that has characteristics similar to mild schizophrenia. Schizophrenic patients are known to complain of severe pain for which no cause can be found. *Attorneys' Textbook of Medicine,* at 178.51.

and exertional impairments were considered, there was, in reality, no combined treatment in the ALJ's subjective symptom analysis or elsewhere. Title 42 U.S.C. § 423(d)(2)(C) requires the Secretary to consider the combined effects of impairments. *Foster v. Bowen,* 853 F.2d 483, 490 (6th Cir.1988).

And finally, although credibility determinations are within the province of the ALJ, there does not appear to be any valid reason for disbelieving appellant's assertions. There were no inconsistencies in his testimony or statements to doctors regarding his pain. *Gooch v. Secretary of Health and Human Services,* 833 F.2d 589, 592 (6th Cir.1987). His subjective statements remained consistent after the 1979 injury and hospitalization.[11] Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation. The Secretary found appellant's complaints less than credible given a perceived paucity of medical proof. However, this should not be a determinative factor in a credibility assessment. It, in effect, readdresses the *Duncan* analysis, where reasonableness of complaints in light of medical evidence has already been assayed.

The foregoing establishes that the Secretary's determination that appellant was not disabled within the meaning of the Social Security Act until November 13, 1985 is not substantiated by the record. The Secretary's decision is hereby reversed and remanded to obtain such additional evidence regarding the progression of appellant's impairment as obtainable and to call on the services of a medical advisor in determining the disability onset date.

DAVID A. NELSON, Circuit Judge, concurring.

I agree that the district court erred in affirming the decision of the Secretary. The ALJ found that "the claimant primarily suffers from a mental disorder that slowly progressed in intensity during the years after 1979." The ALJ further found that the claimant was disabled on November 13, 1985, the date of the psychiatric examination by Dr. Lurie. Although I do not believe that the ALJ was required to accept the claimant's subjective complaints at face value, or to accept at face value the conclusions of Dr. George, who in 1982 made a diagnosis of "schizoid personality" on the basis of a single interview, without having the benefit of an accurate history and without any psychological testing, I can find no evidentiary support for the ALJ's conclusion that the claimant's disability did not arise until the very eve of Dr. Lurie's examination in November of 1985.

Social Security Rule 83–20 declares it "essential" that the onset date of disability "be correctly established and supported by the evidence...." Where, as would seem to be the case here, it is possible to infer that the onset of the disability occurred at some point prior to the date of the first recorded medical examination establishing disability, SSR 83–20 says that the onset date "must be fixed based on the facts...." A finding that the claimant's progressive mental disorder became disabling on November 13, 1985, cannot rationally be based on the fact that Dr. Lurie happened to conduct his examination on that date.

SSR 83–20, as I read it, makes it clear that in a case such as this the ALJ is not to determine the onset date without having called on the services of a medical advisor: "At the hearing, the administrative law judge ... should call on the services of a medical advisor when onset must be inferred." That was not done here, and I fully agree with the conclusion that this case must be sent back so that the informed judgment of a medical advisor can be obtained.

I have no way of predicting what the medical advisor will say, and it remains to

---

11. In 1980, appellant complained of back pain to Dr. Wayne; in 1981, he told Dr. Feuss about his headaches and inability to lift; in 1983, he informed Dr. George that his back hurt whenever he lifts; and he started back pain treatments with Dr. Shafer in January of 1985.

be determined whether the onset of disability did or did not occur before June 30, 1985, the date on which the claimant last met the insured status requirements. Nothing said here, I take it, should be taken as intimating how we think the question ought ultimately to be decided.