935 F.2d 271
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Betty F. SENTER, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 90-5981.
 United States Court of Appeals, Sixth Circuit.
 June 11, 1991.
 
 Before BOYCE F. MARTIN, Jr. and BOGGS, Circuit Judges, and ENGEL, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Betty Senter appeals from the denial of her application for disability benefits by the Secretary and the district court. Because substantial evidence supports the Secretary's determination, we affirm the denial of benefits.
 
 
 2
 * Senter worked as a dog groomer out of her own home from 1970 to March 9, 1984. She alleges that she stopped work permanently on that date because pain in her neck and arm had become intolerable. Senter had two operations in early 1984 that successfully relieved that pain.
 
 
 3
 Senter had already applied for disability benefits by the time of her operations. She visited her treating neurosurgeon, Dr. Harold Smith, on June 12, 1984, before the first disability hearing. She stated then that she had no shoulder, neck or radicular arm pain, but that she had some lower back pain. Dr. Smith believed she was depressed and anxious about her lower back pain, which was not improving despite exercise.
 
 
 4
 Senter's original attorney requested information from Dr. Smith in connection with this first application. Dr. Smith replied that he did not believe Senter was totally disabled. While he said "she cannot perform a job where she either has to stand for a prolonged period of time, or walk for any extended period of time," he noted "she could do a sedentary type job quite easily where she was not lifting or doing heavy labor." Smith repeated that assessment in a letter given to Senter, addressed "To Whom It May Concern" and dated July 31, 1984. Relying in large part on Dr. Smith's assessment, an ALJ denied her application on October 26, 1984. Senter did not appeal.
 
 
 5
 Senter continued to feel uncomfortable, and saw doctors and a psychologist. She saw Dr. Smith on numerous occasions, and his assessment did not significantly change. On October 12, 1984, he noted that she was experiencing "a little pain and numbness in the arm," but "was doing about the same overall." On June 26, 1985, he discounted her complaints of pain with the following statement:
 
 
 6
 If you question Mrs. Senter in the office, she does indeed have a myriad of complaints.... Her numerous complaints of body aches are completely unrelated in my opinion and I think she definitely has a strong component of anxiety. My observations are immediately clouded by the fact that on the same day that she is seen in my office, I also get a request from the Disability Determination Section requesting her records. I therefore cannot help but be mildly skeptical of her complaints as she previously had a flare-up of complaints when she was awaiting another disability hearing.
 
 
 7
 On July 11, 1985, he stated that many of her complaints are consistent with her depression, and on September 5, 1985 he wrote her a letter telling her that rating her impairments according to AMA guidelines, as he would be required to do, "will not put you on complete disability."
 
 
 8
 Senter also visited three other doctors before the expiration of her insured status on September 30, 1985. Dr. William Clark stated that Senter's spinal stenosis would make it difficult for her to stand for "an extended period of time," but he filled out a residual functional capacity (RFC) assessment form stating she could sit for eight hours a day and had no limitations on her ability to reach, handle, or finger things. Drs. Edmund Benz and Louise Patrhan also filled out RFC forms, with both doctors concurring that Senter could sit about six hours out of an eight-hour day and had no limitations on her handling, reaching or fingering abilities.
 
 
 9
 Dr. Scott Gale performed a psychological examination on Senter on July 5, 1985. He found that she felt trapped in life and unable to change her condition. Despite her fears, she was active.
 
 
 10
 She generally awakens at 8:00 in the morning and is able to take care of her personal needs without assistance.... She tries to wash some clothes, though she noted that some days she cannot do any housework at all whereas other days she can do light housework. She tries to wash dishes, though she is prone to cut herself because of the numbness in her hand. She walks in the yard two or three times a day for exercise. She feeds chickens about her farm. She often lies on the couch and watches television. She enjoys soap operas such as As The World Turns and The Young and The Restless. She used to enjoy crocheting and occasionally tries to now but finds she lacks the dexterity required. She is able to drive and will drive short distances if no one is available to drive her. She and her husband go shopping every two weeks. She generally does the shopping, then gets her husband to stand in the checkout line as she cannot endure the pain involved in standing. She visits her mother-in-law about twice a week for an hour or two each visit.
 
 
 11
 Senter's own descriptions of her activities on her benefit applications mention many of these activities in less detail.
 
 
 12
 A great deal of evidence regarding her physical condition was generated after the expiration of her insured status. After examining Senter in February 1986, Dr. John Sergent opined that Senter had fibrositis, a condition of generalized aches and pains. He further opined that her problems stemmed mostly from an inability to sleep well because of her pain. Dr. Smith also assessed Senter's capacities in 1986 when he filled out an RFC form for Senter's new attorney on July 14, 1986, and referred the attorney to a letter he wrote to Dr. Sergent on February 13, 1986. The RFC form stated that Senter could only sit up to four hours in an eight-hour day, that she could stand only two hours in such a day, and was completely capable of using her hands for simple grasping and fine manipulation. His February 13 letter states that "[s]he certainly continues to have bilateral radicular arm pain" and "that this lady in my opinion does have a significant component of anxiety and depression."
 
 
 13
 More information was developed in 1987 and 1988. Dr. Smith, in a discharge form from Baptist Hospital dated February 11, 1987, stated again that he thought her problem was related to her depression. Dr. Sergent filled out an RFC form in March 1988 and opined that Senter could stand no more than one hour in an eight-hour day, and could sit for no more than three of those hours. Dr. Clark also filled out a medical assessment form in September, 1987 and found neither her sitting nor her manual dexterity impaired in any way.
 
 
 14
 Other information on her condition includes a diagnosis from neurologist Rex Arendall, and letters from her family and friends. Dr. Arendall saw her for the first time in September 1987, and found chronic lumbar and cervical radiculopathy, cervical spondylosis, and osteosclerosis. By July 1988, he found her pain had stabilized but that she was depressed about her situation. He opined that she should not bend, stoop, or lift more than twenty-five pounds on a repetitive basis at home or work.
 
 
 15
 Mr. and Mrs. Seagraveses' letters to the court stated that Senter's physical abilities had markedly declined. Mrs. Seagraves's letter stated that Senter has been unable to do anything involving physical labor except light housework and cooking since the summer of 1985, and that her condition had markedly declined from November 1987, when the Seagraveses moved to Illinois, through July 12, 1988. Mr. Seagraves corroborated his wife's statement about Senter's decline after their move to Illinois. Saucy Penrod wrote to say that Senter had been functionally housebound since her retirement from work in 1984.
 
 
 16
 Senter's application was denied in 1986 by an Administrative Law Judge ("ALJ" ), but was remanded to the ALJ following the decision in Samuels v. Bowen, No. 82-2827-M (W.D.Tenn. March 16, 1987). Upon re-examination, the ALJ again denied her application for benefits on August 28, 1988. In both instances, the ALJ found that Senter's pain only prevented her from walking or standing extensively and performing her work as a dog groomer. The ALJ then applied the grids to find that although Senter could not return to her previous job as a dog groomer, she retained the physical capability to perform sedentary work. This appeal followed after the Appeals Council and the district court affirmed the ALJ's decision.
 
 II
 
 17
 Our review of appeals from the denial of social security disability benefits is limited. We must affirm the Secretary's determination if it is supported by substantial evidence, Houston v. Secretary of Health and Human Services, 736 F.2d 365 (6th Cir.1984), even if substantial evidence also exists to support the opposite determination. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir.1986). An applicant must prove that a disability arose during the time period which the applicant was eligible for social security benefits. Any previous application that was denied acts as res judicata for any disability claim up to that date. Siterlet v. Secretary of Health and Human Services, 823 F.2d 918 (6th Cir.1987). Here, Senter's previous application was denied on October 26, 1984, and her insurance eligibility expired on September 30, 1985. Thus, she must prove that she became disabled between October 27, 1984 and September 30, 1985.
 
 
 18
 We believe that substantial evidence exists to support the Secretary's determination that Senter was not disabled during the appropriate time period. Not one doctor opined that she was disabled during that period. Dr. Smith, her treating neurologist, stated both privately and in letters to Senter and her attorney that she was physically capable of working at a sedentary job without substantial physical demands. Dr. Gale reported that her daily activities included light housework, feeding chickens, and walking in her yard for exercise. These activities demonstrate a significant physical capacity. Additionally, the other doctors who filled out RFC forms all opined that she could sit at least six hours during an eight-hour day, and that she had no limitations on her ability to use her hands and fingers for grasping and manipulation. Sedentary work is defined as involving lifting no more than ten pounds at one time, standing and walking occasionally, and sitting for at least six hours in an eight-hour day, 20 C.F.R. Sec. 404.1567(a); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 498 (6th Cir.1985), and requires bimanual dexterity. Absolutely no medical evidence exists from the relevant time period to suggest that she did not meet the requirements for sedentary work.
 
 
 19
 Senter relies on evidence that came into existence after the expiration of her insured status for her claim that the grids were improperly applied. She notes that Dr. Smith's assessment, dated July 14, 1986, stated that she could sit no more than four hours in each eight-hour day and that she was unable to use her hands and feet for pushing and pulling on arm controls or repetitive movements. She contends that Dr. Smith's statement in July, 1984 that she could perform sedentary work should be discounted because Dr. Smith did not know the definition of "sedentary." She arrives at this conclusion by pointing out that Dr. Smith stated that she could not perform "light work in a sedentary setting," and "light work" and "sedentary work" are two different terms with different definitions according to the grids.
 
 
 20
 Senter's argument requires us to interpret our holding in Blankenship v. Bowen, 874 F.2d 1116 (6th Cir.1989). In Blankenship, we relied on evidence of a psychiatric exam that occurred four and one-half months after the expiration of the applicant's insured status to reverse the district court's determination that the applicant was not disabled. Accordingly, we are not legally precluded from examining evidence that arises after the expiration date to establish that a claimant was disabled before the expiration date.
 
 
 21
 We view Blankenship as establishing that evidence of disability arising subsequent to the expiration date may be relied upon by a court when that evidence leads to a solid conclusion that the claimant was disabled during the claimant's insured status. This principle provides a fair way to reconcile the rule that benefits are granted only for disabilities arising during the insured period with the fact that a claimant may not understand the rules so as to arrange medical examinations to coincide with the expiration of insured status.
 
 
 22
 The evidence we considered in Blankenship fit these guidelines perfectly. The claimant suffered from a progressive mental impairment that had been increasing in severity over a number of years. The psychologist examining Blankenship on November 13, 1985, specifically noted that he was 100% disabled, and that he suffered from a progressive disease that had been diagnosed at three previous exams in 1980, 1981, and 1982. Blankenship, 874 F.2d at 1119-20. Upon these facts, we concluded that Blankenship could not possibly have become wholly disabled on November 13 as the progressive nature of the mental disease must have disabled him at some earlier date. Id. at 1121. We noted that a physician who examined Blankenship in September 1985, only a little over two months after his expiration date, had found him sullen, hostile, and uncooperative, symptoms that were consistent with Blankenship's mental disorder of a schizophreniform or schizophrenic disorder. As Blankenship's insured status only expired on June 30, 1985, there was no psychological evidence covering the period between September 1982 and November 13, 1985, and the Secretary did not contest the final determination that he was disabled on November 13, 1985, we held that the Secretary's determination that Blankenship was not disabled until that date was not supported by substantial evidence.
 
 
 23
 None of the factors that led us to consider the subsequently developed evidence in Blankenship are present here. First, Blankenship's disease was a slowly progressive one. His impairment progressed over time at a slow and fairly constant rate. In mathematical terms, the progress of the disease over the time elapsed, if plotted on a graph, would show a line with a small slope. That small slope permitted us to infer that it was almost certain that Blankenship was disabled as of his expiration date because Blankenship's condition could not have significantly changed over the small amount of time between the expiration date and November 13.
 
 
 24
 Of course, this approach is also applicable to cases involving rapid deterioration. For example, a claimant suffering from rapidly spreading cancer who presented evidence of a physical evaluation establishing disability shortly after the expiration date might also qualify for disability under the Blankenship framework.
 
 
 25
 Here, Senter has not established that she has a progressive disease with a slope that would permit us to infer with substantial certainty that she was disabled as of September 30, 1985. No medical evidence exists that shows a deterioration in her condition. In fact, the medical evidence shows a remarkable stability in her condition. Dr. Smith continued to opine that her problem was related to anxiety and depression, and never stated that her range of movement or reported pain had significantly increased. Even Dr. Arendall, who saw her first in 1987, opined that her pain had stabilized by July 1988. He also stated only that Senter should not stoop, bend, or lift more than twenty-five pounds at work. This assessment is not significantly different than arrived at by Dr. Smith in mid-1984.
 
 
 26
 The letters from family and friends offered by Senter also do not paint a picture of a woman with a slowly progressive disease whose status had changed little since September 1985. Mrs. Seagraves specifically remarks that Senter has markedly declined between November 1987 and July 1988. If anything, this suggests that Senter's impairments have approached disability only lately, which unfortunately for Senter is well outside the legal cutoff date for eligibility.
 
 
 27
 Nor does Senter's evidence lead us to a solid conclusion that she was disabled during the relevant period. Neither Dr. Smith nor Dr. Sergent explains why their assessments had changed since their examinations during the insured period. Unlike in Blankenship, where there was no evidence regarding the progression of his mental impairment for the last three years of the insured period, here there is a wealth of medical evidence from the insured period supporting the Secretary's finding of no disability. Also, Dr. Clark's assessment from 1987 contradicts Dr. Smith's and Dr. Sergent's in finding Senter capable of performing sedentary work, and Dr. Arendall's 1988 statement agrees with that assessment. On this evidence, we cannot state that the subsequent evidence offered by Senter precludes a finding that substantial evidence supports the Secretary's conclusion that Senter had the physical capability to perform sedentary work as of September 30, 1985.
 
 III
 
 28
 Senter also contends that she suffers from disabling pain arising out of her cervical and spinal problems. She argues that the ALJ wrongly required her to demonstrate the existence of "an impairment so severe that it can reasonably be the basis of the pain." Instead, she contends that the law only requires her to show the existence of "an impairment which could be the basis for the pain."
 
 
 29
 Senter is mistaken. While pain alone can establish eligibility for disability benefits, McCormick v. Secretary of Health and Human Services, 861 F.2d 998 (6th Cir.1988), that pain must be severe. A claimant's pain will only be found disabling when:
 
 
 30
 There [is] evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.
 
 
 31
 Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir.1986).
 
 
 32
 Thus, the Secretary must try to gauge the severity of either the condition or the pain rather than simply trust claimant's testimony and see if something is wrong with her.
 
 
 33
 The Secretary's determination that Senter does not suffer from severe and disabling pain is supported by substantial evidence. None of Senter's physicians have ever opined that she suffered from disabling pain. Dr. Smith, her treating neurologist during the insured period, clearly thought that Senter's pain was attributable to nervousness or anxiety, and noted the coincidence between flare-ups in her complaints and the onset of her disability hearings. While he said she did suffer from radicular arm pain, Senter does not show that such pain is inherently disabling and none of her neurologists considered it disabling. Senter's underlying medical condition was not of the sort that could reasonably be expected to cause disabling pain.
 
 IV
 
 34
 Senter also argues that the ALJ improperly discredited her testimony that she was disabled by pain, thereby understating the severity of her pain. The ALJ stated that he did not "question [Senter's] integrity or honesty but the record suggests that the claimant tends to underestimate her abilities and to unconsciously perhaps exaggerate her discomfort." The ALJ determined that Senter could not suffer from disabling pain and maintain the activities related by Dr. Gale.
 
 
 35
 This court will not lightly overturn the credibility determination of an ALJ. Houston, 736 F.2d at 367; Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir.1987). An ALJ can take the daily living activities of a claimant into account when making his determination. Crisp v. Secretary of Health and Human Services, 790 F.2d 450, 453 (6th Cir.1986). It is reasonable to infer that a person doing everything that Dr. Gale found in his psychological evaluation is not suffering from disabling pain. The ALJ's credibility determination was not so incorrect as to permit reversal.
 
 V
 
 36
 For the foregoing reasons, the district court's judgment and the Secretary's determination is AFFIRMED.