**Daniel REGENNITTER,**
**Plaintiff–Appellant,**

v.

**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION,**
**Defendant–Appellee.**

No. 98–35004.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 5, 1998.*

Decided Feb. 24, 1999.

---

* Upon appellant's motion, the panel unanimously finds this case suitable for disposition without oral argument. Fed. R.App. P. 34(a); 9th Cir. R. 34–4.

David B. Lowry, Portland, Oregon, for the plaintiff-appellant.

Richard H. Wetmore, Office of the General Counsel, Social Security Administration, Seattle, Washington, for the defendant-appellee.

Before: NOONAN, THOMPSON and TROTT, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Daniel Regennitter ("Regennitter") appeals the district court's order affirming the Commissioner of the Social Security Administration's (the "Commissioner's") denial of his claims for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* In denying Regennitter's claims, the Administrative Law Judge (ALJ) rejected Regennitter's testimony, his mother's testimony, and an examining psychologist's opinion. Although the ALJ provided what appear to be facially appropriate reasons for his disbelief of this evidence, we conclude that the ALJ's reasons are not supported by substantial evidence in the record. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

### Regennitter's Testimony

Regennitter's troubles began in 1988 when, while working at a construction site, an 8–by–12–by–20–foot beam fell on his head and rolled onto his shoulder. In 1990, just as he was beginning to recover from back, neck, and shoulder injuries, Regennitter suffered an accidental gunshot wound to his right leg. He testified about his resulting limitations at two hearings, the second of which occurred after his case was remanded for the exploration of his mental condition. At both hearings, Regennitter complained of severe daily headaches; constant pain in his neck, shoulder, and back; occasional crying spells; and almost daily, half-hour-long panic attacks. He estimated that he can stand and walk for a total of two hours each day and sit for a total of three or four hours per day. The vocational expert called by the Commissioner at Regennitter's second hearing testified that an individual who suffered from Regennitter's alleged limitations would be unable to work.

Because Regennitter produced medical evidence of underlying impairments consistent with his complaints and there is no affirmative evidence that he is malingering, the ALJ's reasons for rejecting Regennitter's testimony must be clear and convincing. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). The ALJ posed multiple reasons for rejecting Regennitter's testimony. These reasons, however, are not supported by substantial evidence in the record.

The ALJ asserted that Regennitter's complaints are inconsistent with the lack of treatment he has received in recent years. Regennitter received regular treatment, however, until his insurance coverage ran out, and he still saw treating doctors five times and examining doctors four times in the next two years. In total, Regennitter received treatment on thirty-two occasions during the five years prior to his second hearing (1988–93). Particularly because none of the many physicians Regennitter has seen has suggested effective treatment for his pain, the amount of medical treatment Regennitter has received is not necessarily inconsistent with his complaints.

Further, the record corroborates Regennitter's uncontested explanation for not seeking more treatment: he could not afford it. Regennitter had no income for many years

prior to his hearings, and he has incurred thousands of dollars of debt. Although we have held that "an unexplained, or inadequately explained, failure to seek treatment ... can cast doubt on the sincerity of [a] claimant's pain testimony," *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989), we have proscribed the rejection of a claimant's complaints for lack of treatment when the record establishes that the claimant could not afford it, *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.1996).[1] *Cf. Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir.1995) (" 'It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.' ") (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir.1984)).

Similarly, because Regennitter established that he can rarely afford prescription medication, the ALJ, in rejecting his testimony, improperly relied on the ground that he "has not required strong analgesic medication ... in recent years." *See Smolen*, 80 F.3d at 1284 (holding that because a claimant testified that "she had no insurance and could not afford treatment," her failure to take medication for her symptoms "is not a clear and convincing reason for discrediting her symptom testimony.") Moreover, the record repeatedly documents that Regennitter compensates for his inability to take prescription medication by overdosing on large quantities of over-the-counter pain medication.

Two other reasons cited by the ALJ for discounting Regennitter's testimony are, respectively, irrelevant and inaccurate. The ALJ noted that Regennitter's treating physician had released him to return to light duty after his neck and back injury. This release, however, is not relevant to Regennitter's ability to work after the gunshot wound to his leg and the manifestation of his mental illness. The ALJ also noted that Regennitter "admitted to significant walking activity with his daughter." This is an inaccurate characterization of the evidence. When Regennitter was asked the maximum distance he could walk, he said that he could walk very slowly with his four-year-old daughter for one and one-half blocks if he rested in the middle. This testimony is consistent with both Regennitter's other testimony and his alleged disability. *See Fair*, 885 F.2d at 603 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, ... and many home activities are not easily transferable to what may be the more grueling environment of the workplace ...") (citations omitted).

The ALJ also determined that Regennitter's complaints are "inconsistent with clinical observations." This determination could satisfy the requirement of a clear and convincing reason for discrediting a claimant's testimony, except that the ALJ did not specify what complaints are contradicted by what clinical observations. *See Lester*, 81 F.3d at 834 ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."). The ALJ noted that Dr. Steven Glusman, an orthopedic specialist who examined Regennitter for the Commissioner, found in Regennitter no "severe objective neurological or orthopedic deficit," but Dr. Glusman did not opine that this was inconsistent with Regennitter's complaints. In fact, Dr. Glusman found that Regennitter suffered from chronic headaches and chronic back, neck, shoulder, and leg pain. Moreover, Dr. R.J. Grondel, a neurol-

---

1. The district court noted an argument, that was implied but not articulated by the ALJ, for disbelieving Regennitter's claim that he could not afford treatment: Regennitter had applied for medical coverage under the Oregon Health Plan ("OHP"), "but [he] did not follow up on the application." This argument is based on only two statements in the record. When the ALJ asked during the second hearing whether Regennitter was an OHP member, Regennitter responded that he was not but that he had recently learned how to apply. Regennitter's counsel later asked Regennitter if he had applied for OHP. Regennitter replied that he filled out "some pa-

perwork," but he "never received anything." Particularly in light of Regennitter's mental illnesses and low IQ (18th percentile compared to others his age), these ambiguous statements do not support the inference that Regennitter could have received medical treatment from OHP but he chose not to pursue it because his complaints are not as severe as he asserts. *Cf. Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir.1996) (" '[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.' ") (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989)).

ogist who examined Regennitter for the Commissioner, specifically concluded that Regennitter's subjective complaints were "reasonably consistent" with Dr. Grondel's objective findings. Similarly, Dr. John Brookhart, Regennitter's treating physician, confirmed that Regennitter's complaints of back and leg pain were supported by "medically acceptable clinical or laboratory diagnostic techniques."

Finally, the ALJ speculated that Regennitter had chosen a sedentary lifestyle "perhaps related to divorce and child support issues, rather than due to physical or psychological limitations," but the ALJ did not point to any evidence in the record to support this speculation. Both Regennitter and his mother testified that he is frustrated to tears by his inability to perform household tasks, rather than "content" with a "voluntary lifestyle." Moreover, the record establishes that Regennitter's wife divorced him long after the onset of, and because of, his disability and that Regennitter worked hard at rehabilitating himself for many years prior to applying for disability benefits.

### Regennitter's Mother's Testimony

■ Regennitter's mother corroborated every aspect of his testimony. She testified that Regennitter is in constant pain and spends much of the day resting with his legs elevated. She stated that she believes he suffers from depression and anxiety. She testified she makes his meals, ties his shoes, and buys him a new supply of Excedrin, Doan's Pills, Advil, Tylenol, Bufferin, and aspirin every ten days. Such testimony by a lay witness provides an important source of information about a claimant's impairments, and an ALJ can reject it only by giving specific reasons germane to each witness. *Smolen,* 80 F.3d at 1288.

■ The ALJ did provide specific reasons for discounting Ms. Regennitter's testimony, but those reasons are not supported by substantial evidence in the record. The ALJ asserted that Ms. Regennitter's testimony is

"inconsistent with [her] apparent failure to help [Regennitter] obtain treatment for his conditions." The ALJ, however, did not dispute Mrs. Regennitter's explanations for this asserted "failure." Ms. Regennitter testified she was Regennitter's sole source of support, housing and feeding, and that caring for him already overtaxed her limited resources. She added that she felt unqualified to determine if her perceptions of her son's mental problems were actually indicative of treatable mental illnesses.

■ The other reason the ALJ gave for rejecting Ms. Regennitter's testimony is her alleged bias as his mother. We have explained, however, that "[t]he fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant everyday is of particular value[;] . . . such lay witnesses will often be family members." *Smolen,* 80 F.3d at 1289 (citation omitted).

### Dr. Manfield's Opinion

■ Dr. David C. Manfield, a clinical psychologist, diagnosed Regennitter as suffering from major depression, post-traumatic stress disorder, nightmare disorder, and panic disorder. He concluded that Regennitter "is certainly psychologically handicapped and experiences extreme limitations in activities of daily living, social functioning, persistence, and pace." Dr. Manfield completed a Psychiatric Review Technique Form, indicating that Regennitter exceeded the criteria of the Listings[2] for Affective Disorders (Listing 12.04) and Anxiety Related Disorders (Listing 12.06).

■ Dr. Manfield was an examining medical expert. To reject his opinion, the ALJ had to give clear and convincing reasons. *See Lester v. Chater,* 81 F.3d 821, 830 (9th Cir.1995). Even if contradicted by another doctor, the opinion of an examining doctor can be rejected only for specific and legitimate reasons that are supported by sub-

---

**2.** The Commissioner has acknowledged certain impairments to be so severe as to preclude substantial gainful activity. These impairments are set out in the Listing of Impairments, 20 C.F.R.

Part 404, Subpt. P, App. 1. A claimant whose impairment or combination of impairments meets or equals the "Listings" is presumptively disabled.

stantial evidence in the record. *Id.* at 830–31. The ALJ assumed that Dr. Manfield's opinion was contradicted by the opinion of Dr. Gary Sacks, a clinical psychologist who examined Regennitter at the request of the Commissioner. The ALJ concluded that "the report from Dr. Sacks [is] persuasive that [Regennitter] has at most moderate restriction on his ability to perform the mental demands of work activity."

The primary error in the ALJ's reasoning is the assumption that the two psychologists' opinions are contradictory. They are not. Dr. Sacks determined, based on an interview and a Mental Status Exam ("MSE"), that Regennitter suffered from major depression and panic disorder. Dr. Sacks did not opine about Regennitter's ability to work, and his report does *not* state that Regennitter's restrictions are "at most moderate."

Dr. Manfield followed up with two clinical interviews, an MSE, and a battery of objective tests of Regennitter's mental function. He confirmed Dr. Sacks's diagnoses of major depression and panic disorder and added the diagnoses of post-traumatic stress disorder and a nightmare disorder. Nothing in Dr. Sacks's report rules out Dr. Manfield's more extensive findings. The primary difference between the two opinions is that Dr. Manfield supplemented his report with detailed quantifications of Regennitter's limitations. Dr. Sacks did not quantify his findings because he was not asked to do so by the Commissioner.

We conclude that the ALJ erred in rejecting Dr. Manfield's report on the basis of a conflict between the two psychologists; there is no conflict. *See Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996) ("Where the purported existence of an inconsistency is squarely contradicted by the record, it may not serve as a basis for the rejection of an examining physician's conclusions.").

■ Moreover, the ALJ's reasons for rejecting Dr. Manfield's opinion are unpersuasive. In *Embrey v. Bowen,* 849 F.2d 418 (9th Cir.1988), we explained that conclusory reasons will not justify an ALJ's rejection of a medical opinion:

To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim. The ALJ must do more than offer his own conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.

849 F.2d at 421–22.

Here, the ALJ asserted that Dr. Manfield's conclusions were inconsistent with Regennitter's "benign Mental Status Exam." However, neither psychologist characterized the results of Regennitter's MSEs as benign. Dr. Sacks found Regennitter to be tearful and sad, with a monotone and hypophonic voice and psychomotor retardation. Dr. Manfield noted Regennitter's blunted affect and uncontrolled crying.

■ The ALJ also asserted that Dr. Manfield's diagnoses are "discounted by [his] failure to refer [Regennitter] for hospitalization or treatment." This assertion ignores the well-established distinction between an examining and a treating doctor. *See, e.g., Lester,* 81 F.3d at 830 ("Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."); 20 C.F.R. § 404.1527 (defining medical opinions and prescribing the respective weight to be given the opinions of treating sources and examining sources). Like the doctors who examined Regennitter at the Commissioner's request, Dr. Manfield was neither asked, nor paid, to provide treatment for Regennitter, but rather to give an objective opinion about his medical condition.

Nor is Regennitter's failure, because of his poverty, to seek "treatment by any mental professional" a valid reason for the ALJ to reject Dr. Manfield's opinion. Indeed, we have particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because " 'it is a questiona-

ble practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Nguyen*, 100 F.3d at 1465 (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989)).

The ALJ also asserted that Dr. Manfield's opinion is inconsistent with the "absence of [a] diagnosis [of mental illness] by any treating source" and the "absence of [any] finding of significant mental abnormalities by sources treating [Regennitter's] physical complaints." These assertions tend to penalize Regennitter wrongfully for his paucity of medical treatment. More importantly, they are contrary to the record. Dr. Brookhart diagnosed Regennitter as suffering from depression; noted that Regennitter suffered from nervousness, depression and anxiety; and recommended that Regennitter undergo a complete psychological examination. Dr. Glusman, who merely examined Regennitter once, still concluded that .he probably suffered from major depression.

The ALJ further stated that Dr. Manfield's opinion was inconsistent with the absence of "observation of [Regennitter's] more extreme complaints, such as nightmares and panic behavior by any disinterested third party." Both Dr. Sacks and Dr. Manfield, however, diagnosed Regennitter's panic disorder. Moreover, the ALJ does not explain the justification for his expectation that nightmares and panic attacks-intrinsically private, solitary behavior-should be witnessed by strangers. Nonetheless, Regennitter had a credible witness to both his panic attacks and his nightmares: his mother testified to numerous specific symptoms of his mental problems, such as his regularly waking up screaming in the middle of the night.

Finally, the ALJ commented that "Dr. Manfield appears to have taken [Regennitter's] statements at face value." This comment is contrary to the evidence. Neither Dr. Sacks nor Dr. Manfield found any indication that Regennitter was malingering or deceptive. Therefore, neither psychologist should be faulted for believing Regennitter's complaints. More importantly, Dr. Manfield interviewed Regennitter twice, confirmed his complaints with his mother, and conducted extensive objective psychological testing. Dr. Manfield explained in detail how the results of each test supported his diagnoses. Dr. Manfield did not simply "take[ ] [Regennitter's] statements at face value."

*Conclusion*

Although the ALJ provided facially cogent reasons for rejecting the testimony of Regennitter and his mother and the opinion of Dr. Manfield, those reasons are not supported by substantial evidence in the record. Accordingly, we reverse the Commissioner's decision denying Regennitter's applications for Disability Insurance Benefits and Supplemental Security Income. We do not consider the other issues raised in this appeal.

Where we conclude that a claimant's testimony or a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits. *Smolen*, 80 F.3d at 1292; *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir.1989). We would do so here, except for an unresolved issue. Regennitter became disabled under 42 U.S.C. § 423(d)(1)(A) sometime between his injury in 1988 and his second hearing. The date at which Regennitter's disability began will determine whether he is eligible for Disability Insurance Benefits and the amount of Supplemental Security Income to which he is entitled. We therefore remand this case to the Commissioner for resolution of this issue, and for an ultimate disposition consistent with this opinion.

REVERSED AND REMANDED.

