996 F.2d 1216
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Bette PARKER, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, M.D., Secretary of Health and Human
Services, Defendant-Appellee.
 No. 92-1893.
 United States Court of Appeals, Sixth Circuit.
 June 3, 1993.
 
 Before GUY and NELSON, Circuit Judges, and BECKWITH,* District Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Bette Parker, appeals the denial of her claim for disability insurance benefits and supplemental security income. An administrative law judge had determined previously that Parker was not disabled because she was able to perform her past relevant work and she did not have a mental impairment which would affect her ability to function in a work environment. The district court found that substantial evidence existed to support the Secretary's decision, and affirmed the denial of benefits. We affirm.
 
 I.
 
 2
 On September 18, 1987, Parker was hospitalized after falling down a flight of stairs. As a result, she suffered a fracture of three vertebrae, and also complained of a head injury and vertigo. The next day, a sensory and motor examination was normal, and Parker's physician prescribed six weeks of bed rest and a hyperextension back brace. While recovering, Parker worked part-time for three weeks in December 1987 and January 1988 as a phone sales person. She quit that position due to continuing complaints of back pain.
 
 
 3
 Later in the month, Parker's treating physician at the time, Harry Herkowitz, examined her and reported that she had problems standing and sitting, but nevertheless had "satisfactory mobility." Parker had a mild "roundback," and x-rays displayed a moderately severe compression deformity but found no evidence of cord compression. Dr. Herkowitz recommended exercise.
 
 
 4
 Richard Reilly, an orthopedic surgeon, noted increased rounding of Parker's middle and upper back after examining her in March 1988. Parker's neck motion was restricted, but Dr. Reilly found no abnormality or spasm in the neck. Moreover, Parker's ability to bend forward was not significantly diminished. Dr. Reilly also detected tenderness at the lumbosacral junction, but again observed no spasm or restriction of motion. Further, Parker's arm and leg reflexes, sensation, and motor function were normal. X-rays established a healed compression fracture of the tenth dorsal vertebra. Dr. Reilly also concluded that Parker's compression fracture of the dorsal spine had healed. He suggested physical therapy and exercise, and also recommended that Parker not work in a job situation that required repetitive bending and lifting for at least four to six months. However, he did not rule out all work; Dr. Reilly simply felt that Parker "should be placed in a job situation which restricted bending and lifting."
 
 
 5
 In July of 1988, Parker complained of headaches, dizziness, and nausea. R.J. Martocci, a neurologist, examined her, and found that she had mild curvature of the middle to lower thoracic spine. However, Parker's sidebending was only mildly restricted. Her sensation, motor functions, and reflexes were all normal. Dr. Martocci recommended a psychiatric evaluation and ongoing psychotherapy, because he found that Parker had psychogenic overtones and a possible anxiety neurosis.
 
 
 6
 Parker underwent a thoracic rhizotomy (the surgical cutting of a nerve root) on October 28, 1988, to alleviate her back pain. Peter Fragatos, her surgeon and treating physician, reported favorably on the surgery, though he noted some swelling at the incision site. Parker was treated with antibiotics to reduce the swelling and improved greatly, and she was discharged without complaints on November 9, 1988. A month later, however, Parker developed a hematoma in her back. The hematoma was drained, and Parker responded well to antibiotics.
 
 
 7
 In January 1989, Parker stated that she felt her condition improving, and she began riding a stationary bike, walking, and resuming normal activity. Throughout 1989, however, Parker continued to complain of infection at the incision area, and she was treated with antibiotics. A cervical spine x-ray and a neurological examination taken in early 1989 were both normal. In addition, in September 1989, after Parker returned to the hospital with a chronic infection at the incision site, an examination revealed that she had normal arm and leg reflexes, nearly full grip strength, and full leg strength. Her general behavior, level of consciousness, thought content, and emotional state were also within normal limits.
 
 
 8
 Magnetic resonance imaging (MRI) of Parker's cervical spine in October 1989 revealed mild bulging of the intervertebral disc. Yet, no evidence existed of disc herniation. That same month, Dr. Fragatos stated that he had treated Parker since June 1988 and that she had not improved with physiotherapy. After noting that Parker would eventually need to undergo a cervical laminectomy to alleviate her back pain, Dr. Fragatos concluded that Parker was "totally disabled." Upon re-examination of Parker, Dr. Fragatos' conclusion remained unchanged.
 
 
 9
 Dr. Reilly examined Parker again in December 1990, and he reported that she seemed "basically healthy." Parker's neck motion was generally restricted, but Dr. Reilly noted that she had no muscle spasms in either the neck or the spine area. In addition, Dr. Reilly opined that June 1990 x-rays of Parker showed minimal degenerative changes, and he did not feel that evidence of disc herniation existed. However, he concluded that "[t]aking into consideration examinee's medical problems as well as the findigs of the MRI, I would feel that she was totally and permanently disabled. I don't think that she could return to gainful employment. I do not feel that she is a candidate for vocational rehabilitation."
 
 
 10
 Parker was born on May 2, 1947. She has a high school education, and also took college courses in hotel, motel, and restaurant management. From 1972 until her fall in 1987, Parker worked as a telephone operator, a waitress, a service representative for a fiberglass company, a bartender, and a cabinet cleaner.
 
 
 11
 After her fall, Parker's activities decreased. At varying times, she lived with either her son and his family or her sister. She testified that she did very little housework because of her condition. She folded her own laundry, dusted, washed dishes once per day, wrote letters, read, did needlework, did crossword puzzles, watched television, and went to the movies once a month. She no longer attended church, because her back pain did not allow her to sit for more than ten minutes in the pews. She was able to make her own bed, but could not change the sheets. She also went to the grocery store with her sister on Saturdays to do weekly food shopping, but Parker did not load or unload any groceries. Parker did not trust herself to drive because of her condition, and she limited her driving to the grocery one-quarter mile away and to the doctor less than one mile away. She estimated that she could stand for approximately five minutes, could walk around the block, and could sit for 60 minutes in a recliner. In a regular chair, Parker testified that she could sit for 10 to 15 minutes before needing to move. Parker took Medipren for pain as needed, and also sometimes took Talacen when she was in particular pain. Regarding her mental condition, Parker claimed to have emotional problems and to have fear and anxiety about her future.
 
 
 12
 In January and February of 1988, Parker first applied for disability insurance benefits and supplemental security income because of her back problems. Her claim was denied initially and upon reconsideration. An administrative law judge (ALJ) then vacated the denials and remanded Parker's claim for evaluation under the mental impairment regulations. A psychiatrist then reviewed the record, and the applications were again denied.
 
 
 13
 A de novo hearing was then held before another ALJ in October 1989. At that hearing, Parker appeared and testified, as did a vocational expert. In answer to a hypothetical question posed by the ALJ, the vocational expert stated that if Parker's testimony were completely credible, "she would be unable to perform any of her past work." (App. 80.)
 
 
 14
 The ALJ concluded that Parker was not disabled because she could do her past relevant work. The ALJ found that the evidence failed to identify an impairment with respect to the back or cervical region that would account for Parker's claims of severe pain, because there was no evidence of disc herniation or nerve root involvement. Further, Parker's testimony regarding severe pain was found not credible, because the medical evidence did not document such pain and Parker's daily activities were inconsistent with a severity of pain that would preclude employment. Finally, with regard to Parker's mental impairment claim, the ALJ determined that none existed which would affect her ability to function in the workforce. An appeals council reviewed the ALJ's decision and concluded that the ALJ had not completed the psychiatric review technique form (PRTF) properly. It completed the PRTF, reviewed the evidence, and affirmed the ALJ's denial of benefits.
 
 
 15
 Parker then filed a civil action for judicial review in federal district court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). A United States magistrate judge issued a report and recommendation, finding Parker disabled from September 1987 until at least January 31, 1989, and recommended that the case be remanded for a full psychiatric examination to determine when Parker's disability ceased. The district court rejected the magistrate judge's report and recommendation, because it found substantial evidence existed to affirm the Secretary's decision. Parker timely appealed.
 
 II.
 
 16
 Pursuant to 42 U.S.C. § 405(g), we review the final decision of the Secretary for compliance with applicable legal criteria and to determine whether substantial evidence exists in the record to support each necessary finding. Blankenship v. Bowen, 874 F.2d 1116, 1120 (6th Cir.1989). Substantial evidence is "more than a scintilla." Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir.1990) (citation omitted). It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, we must examine the evidence in the record as a whole, and must "take into account whatever in the record fairly detracts from its weight." Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984) (citation omitted). We are mindful that the Secretary's decision must stand if the determination is supported by substantial evidence, regardless of whether we would resolve the issues of fact in dispute differently. Moon, 923 F.2d at 1181. When the appeals council has reviewed the decision of an ALJ, the determination of the council becomes the final decision of the Secretary for purposes of our review. Mullen v. Bowen, 800 F.2d 535, 538 (6th Cir.1986) (en banc).
 
 
 17
 Disability insurance benefits and supplemental security income benefits are available only to those who can establish "disability" within the terms of the Social Security Act, which defines "disability" as the inability to engage in
 
 
 18
 any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....
 
 
 19
 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).
 
 
 20
 Congress has mandated that the Secretary must consider four factors in determining whether the claimant is capable of performing substantial gainful activity: the individual's functional capacity to work, age, education, and job experience. See 42 U.S.C. §§ 423(d)(2)(B) and 1382c(a)(3)(B). In addition, regulations promulgated by the Secretary require following a five-step sequential process in evaluating all claims of mental or physical disability. 20 C.F.R. §§ 404.1520 and 416.920 (1992). The Secretary decided Parker's case at step four of the analysis by determining that Parker had the residual functional capacity to perform one of her past relevant jobs. 20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992). Parker had the burden of proof through step four, and therefore the burden was on her to establish that her impairments prevented her from working in her prior positions. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987).
 
 III.
 
 21
 Parker argues that the ALJ disregarded the evidence in the record in determining that she was not entitled to benefits. According to Parker, substantial objective medical evidence reinforced her claims of disabling pain. Parker also alleges that the ALJ failed to give proper deference to her treating physician's recommendation of total disability. Furthermore, she argues that there were no valid reasons for discrediting her testimony, because the alleged inconsistencies in her testimony which the ALJ found did not in fact exist. In addition, Parker disputes the conclusion that her mental impairment did not meet the conditions for a finding of disability. Thus, she urges reversal of the decision to deny her benefits, because it allegedly is not based on substantial evidence.
 
 A. Parker's Physical Impairment
 
 22
 We review a claimant's allegations of disabling pain under a two-pronged test. First, we examine whether there is objective evidence of an underlying medical condition. If such evidence exists, we then examine: (1) whether the objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the severity of the objectively established medical condition is such that it can reasonably be expected to produce the alleged pain. Duncan v. Secretary of Health and Human Servs., 801 F.2d 847, 853 (6th Cir.1986).
 
 
 23
 The ALJ determined that ample evidence existed to document Parker's impairment related to her back. This finding is supported by substantial objective medical evidence. However, the objective medical evidences does not confirm the severity of the alleged pain arising from Parker's back condition. Accordingly, Parker does not meet even the first prong of the statutory standard, although there is objective medical evidence of an underlying medical condition. The ALJ found that the evidence failed to identify an impairment that would account for Parker's allegations of severe pain. This finding is also supported by substantial objective medical evidence.
 
 
 24
 After Parker fell in September 1987, x-rays showed a compression fracture, but by March 1988, x-rays revealed that the fracture had healed. At that time, Dr. Reilly recommended that Parker engage in an exercise program, and he also concluded that Parker be placed in a job situation with limited bending and lifting. Thus, Dr. Reilly's assessment contradicts Parker's claim of debilitating pain.
 
 
 25
 In addition, as the government points out, physical examination findings have been consistently normal. Shortly after her fall, Parker had a normal sensory and motor examination. Later examinations produced no evidence of neurological deficits, muscle spasms, atrophy, significant reflex deficits, or substantially decreased range of motion. Cf. Crouch v. Secretary of Health and Human Servs., 909 F.2d 852, 857 (6th Cir.1990) (absence of significant neurological deficits and atrophy supported Secretary's conclusion that claimant's allegation of severe pain was not confirmed by the objective medical evidence); Duncan, 801 F.2d at 854 (medical evidence showed no neurological deficits, indicating that claimant's diagnosed infirmities are not so severe that they could reasonably be expected to produce disabling pain). Moreover, Parker's intermittent use of Talacen and Medipren--relatively mild pain medications--belies her allegation of disabling pain. See Kimbrough v. Secretary of Health & Human Servs., 801 F.2d 794, 797 (6th Cir.1986) (evidence that claimant took mild medication does not bear out the severity of claimant's alleged pain); Kirk v. Secretary of Health & Human Servs., 667 F.2d 524, 538-39 (6th Cir.1981) (finding that claimant could perform full range of sedentary work upheld even though claimant prescribed Darvon and Darvocet, medication for mild to moderate pain), cert. denied, 461 U.S. 957 (1983). In sum, substantial evidence existed that would allow a determination that objective medical evidence did not substantiate Parker's claims of disabling pain.
 
 
 26
 Parker next argues that appropriate weight was not given to the opinions of Drs. Reilly and Fragatos, her treating physicians. As Parker indicated, we have previously reaffirmed that the medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted. King v. Heckler, 742 F.2d 968, 974 (6th Cir.1984). However, the ultimate determination of disability rests with the Secretary, and not with the treating physician. Duncan, 801 F.2d at 855. Treating physicians' opinions must be grounded in objective medical evidence, and no deference need be afforded to those opinions if they are simply conclusory. Id. (citations omitted). We believe that in this case the Secretary properly considered the opinions of Drs. Reilly and Fragatos as conclusory and unsubstantiated.
 
 
 27
 Dr. Reilly's January 1991 opinion that Parker was totally disabled suffers from two defects. First, it was not supported by the objective findings in Dr. Reilly's own report. Dr. Reilly found Parker to be a "basically healthy" individual who "walked with a normal gait." Parker complained of tenderness in her neck, and Dr. Reilly noted that she had "some" restriction of motion. However, he found no spasms, atrophy, or asymmetry of the shoulders. Dr. Reilly also observed some tenderness in the lumbosacral spine region, but again found no spasms present. Neurological testing of the upper and lower extremities also revealed nothing. Dr. Reilly also reviewed x-rays, which showed "minimal" degenerative changes to the cervical spine. Dr. Reilly also found no evidence of any disc herniation in the lumbar spine. Thus, Dr. Reilly's conclusion that Parker was totally and permanently disabled is not supported by his medical findings. See Blacha v. Secretary of Health & Human Servs., 927 F.2d 228, 230-31 (6th Cir.1990) (without corroborating medical evidence, reviewing court will generally defer to ALJ's assessment of a treating physician's opinion).
 
 
 28
 Second, Dr. Reilly's January 1991 report contradicts his March 1988 report which recommended that Parker could return to work in a job that did not have heavy bending or lifting. However, none of Dr. Reilly's underlying medical findings in his later report detail significant changes in Parker's overall condition, rendering his January 1991 opinion suspect. Hall v. Bowen, 837 F.2d 272, 276 (6th Cir.1988) (ALJ properly rejected later opinion of physician that was inconsistent with earlier opinion and that was unsupported by new findings of significant changes in claimant's condition). Therefore, the ALJ could properly discount Dr. Reilly's changed opinion.
 
 
 29
 The Secretary did not commit error in refusing to defer to Dr. Fragatos' opinions dating from October and November of 1989 that Parker was totally disabled. Dr. Fragatos' opinions conflicted with Dr. Reilly's initial conclusion in March 1988 that Parker could resume working, and the Secretary had the duty to weigh such evidence. See Richardson, 402 U.S. at 399-400. Dr. Fragatos also did not refer to objective medical evidence when making his determination, and his opinions were reached after making conclusory statements regarding Parker's condition.[1] An ALJ may discredit such unsubstantiated conclusions without fear of reversal by a reviewing court. See Sizemore v. Secretary of Health & Human Servs., 865 F.2d 709, 711-12 (6th Cir.1988) (opinion not entitled to deference when not supported by specific test results or diagnostic procedures).
 
 
 30
 Finally, Parker challenges the ALJ's determination that her testimony was not credible because it contained inconsistencies. Specifically, the ALJ found Parker's testimony of disabling pain unsupported by the medical evidence, her daily activity schedule inconsistent with a finding that she could not continue to work, and her testimony regarding her fall inconsistent with the medical report because at the hearing Parker failed to state that she was drunk at the time of her accident. If the latter incident were the only testimony which the ALJ found inconsistent, his decision that Parker's testimony was less than credible might deserve closer scrutiny. However, we have discussed previously the fact that an ALJ could find that Parker's allegations of disabling pain were not supported by the available medical evidence. Thus, the ALJ's treatment of Parker's testimony was proper. Substantial evidence did exist to support his findings that Parker's physical impairment did not preclude her from performing past relevant work.
 
 B. Parker's Mental Impairment
 
 31
 Parker asserts that the Secretary erred in finding her mental impairment to be nonsevere. The Secretary determined that Parker had possible anxiety, but "absolutely no evidence [existed] of a mental impairment of any significant variety." (App. 27.)
 
 
 32
 In Farris v. Secretary of Health and Human Services, 773 F.2d 85 (6th Cir.1985), we stated that an impairment can only be considered nonsevere where it is a slight abnormality which has such minimal effect on the individual that it would not interfere with that individual's ability to work, regardless of age, education, and work experience. Id. at 90 (citations omitted). Further, when evaluating claims of mental impairment, the Secretary considers the effect of the mental impairment on four areas of function: daily living activities; social functioning; concentration, persistence, and pace; and deterioration or decompensation in work or work-like settings. 20 C.F.R. §§ 404.1520a(b)(3) and 416.920a(b)(3).
 
 
 33
 Parker was involved with several daily activities. No evidence existed that her social behavior was other than ordinary. Although she testified that her concentration was poor because she read books but then was unable to remember the storylines the next day, Parker also testified that she did crossword puzzles and other activities that require concentration. The Secretary also noted that Parker apparently never sought treatment for her mental impairment, nor did objective testing show that her accident resulted in any dysfunction of the brain. Even if Parker did suffer from some anxiety, we find substantial evidence exists to support the finding that Parker's mental impairment was nonsevere.
 
 
 34
 AFFIRMED.
 
 
 
 *
 Honorable Sandra S. Beckwith, United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Dr. Fragatos twice concluded that Parker was totally disabled. His October 1989 report stated:
 [Parker] does have continual complaints of thoracic pain secondary to her thoracic fracture following a fall. She underwent a Thoracic Rhizotomy on October 28, 1988, with moderate results. She also continues to complain of pain in the cervical area and has received repeated courses of physiotherapy with no real improvement.
 I suspect that eventually she will undergo a Cervical Laminectomy for her problem. At this time, I feel that she is totally disabled.
 (App. 350.)
 One month later, he made another report:
 [Parker's] complaints and examination are essentially unchanged as per previous. She continues to be totally and permanently disabled.
 (App. 351.)